## ˙INTERFERENCE WITH BUSINESS BY POLICE.

### Superior Court of Cincinnati.

### ADOLPH HIRSCH v. HENRY T. HUNT, MAYOR, ET AL.

#### Decided, September 3, 1912.

*Injunction—Against Interference with Business by Police—Not Avail-*
*.˙able to One Who May be Concealing Illegal Transactions—*
*Doubts of a. Chancellor will be Resolved Against a Relator Charged*
*with Secretly Carrying on Gambling, When.*

An injunction against the stationing of police about a place of busi-
ness in such a manner as to interfere with the business carried on
therein will be refused, where the court has reasonable ground for
the belief that things of a forbidden character, such as gambling,
are being carried on in connection with such business, and the
plaintiff in his testimony exhibits a lack of candor and a willing-
ness to suppress the facts, and otherwise by his conduct forfeits his
claim on a court of equity.

*J.. S. Myers,* for plaintiff.
*Alfred Bettman* and *John Weinig,* contra.

HOFFHEIMER, J.

This is an action for injunction. Plaintiff charges in sub-
stance, that defendants (mayor, vice-mayor, safety director,
chief of police) have conspired to injure him in his business,
and that in pursuance thereof they have stationed a uniformed
officer in his place of business with instructions to receive all
telephone communications, and that they were otherwise inter-
fering with said business, without authority or warrant of law;
without invitation of plaintiff, and in violation of his constitu-
tional rights; that defendants threaten ˙to and that they will,
unless restrained, continue to station a uniformed officer in said
place of business; that said defendants have assumed arbitrary
and autocratic authority without warrant of law, and will unless
restrained injure and destroy his business to his great and ir-
reparable injury, and that he is without remedy at law.

He prays that an order may issue restraining each of the said defendants, their agents or servants, from in any way intimidating, molesting or interfering with plaintiff in his said business; that a temporary restraining order issue against each of said defendants, their agents or servants from entering his said place of business and from in any manner interfering with said business or in any way interfering with the rights of persons visiting his said place of business or exercising surveillance over persons visiting the plaintiff's place of business, and that upon final hearing said order may be made perpetual, and for all further relief to which in equity he may be entitled.

After hearing the evidence in this case, I find myself beset with doubts concerning the true ownership of the business involved in this controversy, located at 44 East Sixth street, and with reference to which equitable relief is now sought.

And, irrespective of the question of ownership, whether by this plaintiff alone, or in conjunction with Samuel Hirsch, or others, I find I am not free from doubt, as to whether or not this business is not a part of, or not being used directly or indirectly, to further illegal acts, namely, gambling transactions of the kind commonly known as hand books.

These doubts are occasioned not alone by a number of circumstances that are very peculiar, to say the least, but they are intensified as the result of plaintiff's own conduct, while on the stand, by his lack of frankness, and by the suppression on his part of facts, which I can not but conclude was *intentional,* and this, too, under circumstances which made it imperative for him, seeking the equitable intervention of this court, to make the fullest disclosures and to withhold nothing.

The question as to whether or not these premises, or this cigar business, was being used either directly or indirectly, that is, as a ''blind,'' for that secretive and most objectionable form of gambling, known as a hand book, or whether its owners or owner or any one in connection therewith, was engaged in that business, was not in its first instance for this court; nor do I now intend by anything I may say to actually adjudge any one guilty of such offense. That question belongs to, and properly is, for

another forum.  A court of equity, however, will not issue an injunction at the suit of a person, where it appears that he is conducting an illegal business.  See causes collated in note G, Section 402, 1 Pomeroy Equity Jurisprudence, third edition. It will not lend its aid to assist a gambling transaction.  *Albertson* v. *Laughlin,* 173 Penn., 529.

Where the court, therefore, has reasonable grounds to believe or reasonably to suspect that business of such a character is being carried on in connection with the business for which relief is sought, or has doubts about it, which would seem to be more or less well grounded, and particularly if such doubts are due to the plaintiff's lack of candor or willful suppression of facts, having a possible bearing thereon, it would be its duty as a chancellor to refuse to hazard its process in such behalf, just as it would be its duty, to refuse to appoint a receiver to take charge of a business that did not *clearly* appear to it to be a perfectly moral and clean business.

These things are true, because equity is distinctly a court of conscience and of morals, and is ever jealous of its power.  Knowing this, as I have said, it was particularly incumbent upon this suitor, asking the favor of this court, in view of the nature of the charges brought to the court's attention, to be above all things, frank with this court, and with these defendants, and to make the fullest disclosures on any and every matter, relevant to this particular litigation, and so as to relieve this court of any doubts.

The foregoing necessarily results from the fundamental maxim in equity, that he who comes into equity must do so with clean hands.  Not only this, but he must keep them so.  *Bispham's Equity,* Sec. 43, note.

There must be no willful misconduct by him who asks equitable interference, either in respect of the subject-matter in litigation (*Snell's Equity,* 25) or with reference to his procedure in that behalf.  In *Brown* v. *Davis,* 23 U. S. Ap., 579-596, for example, the court withheld relief where there had been reckless charges of fraud and reckless evidence in support thereof.

The maxim referred to, unlike the maxim, that he who seeks equity must do equity, where the court as a condition or price of

conferring the remedy may compel a suitor to provide for a corresponding equity of the defendant, is *restrictive* in its operation.

It assumes that the suitor, asking the aid of a court of equity, has himself been guilty of conduct in violation of the fundamental conceptions of equity jurisprudence, and therefore refuses him *all* recognition and relief, with reference to the subject-matter or transaction in question. It   *   *   *   closes the door of the court against such suitor and refuses to acknowledge his right or to award him any remedy. *1 Pomeroy Equity Jurisprudence,* Sec. 397.

And it is said, at Section 398 *ibid,* while a court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness and conscientiousness on the part of the parties who occupy a defensive position in judicial controversies, it no less *stringently* demands the same from the litigant parties, who come before it, as plaintiffs, or actors, in such controversies.

And again at Section 404, the learned author says:

"It is not alone fraud, or illegality, which will prevent the suitor from entering a court of equity; *any really unconscientious conduct connected with the controversy to which he is a party,* will repel him from the forum whose very foundation is good conscience." [Italics mine.]

I have said that whether this business was directly or indirectly, engaged in a hand book was not originally a question for this court, but the stationing of police officers in this place of business, by a department of our municipal government, presumably in an honest effort to detect or prevent crime, and following a "raid" made by it on the office of Samuel Hirsch in the Lyric Theatre Building, where they confiscated papers and telegrams but lately addressed to 44 East Sixth street, because of the nature of transactions therein indicated, made the question as to the character of the alleged cigar business at 44 East Sixth street, in view of the authorities cited, of importance here.

This plaintiff, Adolph Hirsch, claims that he alone is the owner of the business at 44 East Sixth street. He claims that he is a retail cigar dealer; that his business is legitimate, and in no way

used for transactions such as we have been speaking of. He asserts that he bought the cigar business from his brother Samuel some eight years ago.

In view of these claims is it not *strange* that when, in the latter part of last January or February, the police had been stationed there, evidently as it was then suspected of being a hand book, we find Samuel Hirsch taking it upon himself to see the mayor of our city (a defendant here) requesting him to withdraw the police from *his* store, and assuring him, that on any further complaint the police might be again reinstated? Surely such action must have been known to this plaintiff. It strikes my mind as being very strange also, if this plaintiff is really the owner of the cigar business at 44 East Sixth street, and has been for the last eight years, as he claims, that we should find in the telephone directory of June, 1912, not the name of this plaintiff but *"Samuel Hirsch, Cigars, 44 East Sixth street."* It must be borne in mind that it is claimed that Samuel Hirsch did not even have an office at 44 East Sixth street, for contemporaneously or practically so with his avowal to the mayor as already alluded to, he set up an office in the Lyric Theatre Building, where ostensibly he became engaged, not in cigars, but in the "voting booth business." I do not say that any of these matters standing by themselves, prove ownership in said Samuel Hirsch of this cigar business, but I do say, that to the extent this plaintiff knew or suffered these things to be done, as otherwise indicated in evidence, they are circumstances that can not be wholly cast aside, when considering a thing as *elusive* as a hand book. At or about the time Samuel Hirsch opened his office in the Lyric Theatre building, George Faber and Louis Gatto were taken into the store at 44 East Sixth street, and employed by this plaintiff, so he says, as *clerks*. Chief of Police Copelan says these men had theretofore been suspected by the department of hand booking, and that the places of both or of one of them (I am not positive whether it was one or both), was closed by order of the police. Will it be said that the employment of both of these men in the capacity of cigar clerks

and at the Hirsch store, and at this time, was but a *mere coinci-dence?*

We find further, that *months* after Samuel Hirsch is supposed to have moved his office to the Lyric Theatre Building, where he is engaged in the voting booth business, telegrams in secret code and otherwise, all confessedly relating to racing matters and to betting come addressed to him *at 44 East Sixth street.* Some of these telegrams are signed in initials; others are from another *brother,* Nathan, who surely must have known if these telegrams had nothing to do with 44 East Sixth street, that since January or February Samuel's office was in the Lyric Theatre Building. Another telegram notably the "My Gal" telegram is to Hirsch's cigar store, 44 East Sixth street, and another to Nathan Hirsch, 44 East Sixth street. None, it may be said are addressed to Adolph Hirsch, *eo nomine,* and notwithstanding he must have known of Samuel's avowal to the mayor, we find him not only allowing these things to be done, but complaisantly opening tele-grams, not addressed to him, but to his brother, which however, we are at once informed was by *request only!*

The telegram addressed to Hirsch Brothers, 44 East Sixth street, contains simply the words "My Gal." When plaintiff was shown this telegram (and another containing the words "Paris Green") and asked as to the meaning, his *manner of answering* and the *apparent evasiveness* of his reply were not calculated to inspire the confidence of the court, or to dispel doubts. He said *"he had no idea about it."* On being further pressed he admitted he knew said telegrams referred to racing matters; that his brother owned a race horse, etc.

Now, notwithstanding plaintiff admitted he received at his store and himself opened telegrams, he repeatedly protested that he had nothing to do with that business or that they had any thing to do with him. But all these matters appearing, was it not of extreme importance that he manifest all possible diligence in bringing into court all books, papers and documents that he possessed, and which were asked for, in order that all possible doubts as to these things having some connection with his alleged business, might be set at rest?

Plaintiff was asked for his books. He said he kept none and produced none, save a couple of bank pass books. He claimed that his business was small. He said he did an average daily cash business amounting to $25 a day, save on Saturdays, when it aggregated $50. He did no credit business, so he says, and when occasionally credit was extended, it was in some small amount and he asserted *no memorandum charge would be made of the transaction whatever!*

Current accounts of merchandise purchased are in his name, and some bills exhibited, show this to be true; he pays by check, keeping no stub memorandum; but he did say that he kept canceled checks, and produced a very limited number, which, so far as we can see, purport to be for legitimate transactions.

A very recent lease is made out in his name, and by virtue of it, he pays a rental of $200 per month. In the absence of any books or memoranda kept in the course of business and taking his mere statement on such matters, it would seem by contrasting the necessary expenses for the upkeep and running of this cigar store, including the purchase of merchandise, rent, living expenses, clerk hire and other necessary expenses, with the cash returns of the cigar business that it was in realty a rather small business. Yet in August a bank pass book indicates a single batch of returned checks approximating ten thousand dollar transactions (a rather large amount of dealings for this rather small business) and not satisfactorily explained. He was asked to produce these canceled checks. He had said, as we have heard, that he kept canceled checks. We have already seen that he was able to produce some checks which would seem to indicate legitimate transactions. Plaintiff, however, *failed to produce any of this ten thousand dollar lot,* although he was given ample opportunity so to do.

Considering now that this is an action against public officials, acting in their official capacity, and in an endeavor to suppress crime, and this being an action for injunction, where vigilance and caution are specially enjoined upon the court (*Albery* v. *Sessions,* 2 Nisi Prius, 237), is this court overly vigilant or un-

duly cautious, when it asks itself: would these checks or any of them, have thrown any light on the ownership of this store, doing this small cigar business? Would they have shown that this business was being used directly, or indirectly, for hand book purposes? And is there any peculiar significance in the stubborn fact, that this particular batch of checks, for this large sum of money, relates to the *precise period of time when telegrams such as those confiscated by the police, were, as we now know, being repeatedly addressed to Samuel Hirsch, Nathan Hirsch, Hirch's Cigar Store, 44 East Sixth street, and were being opened by Adolph Hirsch by request?*

The failure to produce one's books or other memoranda, or even the failure to produce a lot of canceled checks under ordinary circumstances might be reconciled with the best of faith, but when we consider such failure under circumstances such as we have here detailed, and when we consider it in connection with the further remarkable fact, that out of a lot of canceled checks returned to plaintiff from the Columbia Bank, *during the noon adjournment hour of the very day of this hearing,* there were strangely missing and wholly unaccounted for, checks for $700 (plaintiff could give no satisfactory explanation), has not this court reasonable grounds for its misgivings—is it not justified in concluding, that the suppression of all these checks was designed and willful?

Such reckless evidence, such manifest lack of good faith is precisely that conduct of which Pomeroy speaks when he says: "It will repel the suitor from a forum whose very foundation is good conscience" (*supra*). It is needless to say more. In my opinion this plaintiff, under all the circumstances has forfeited his claim upon a court of equity, and accordingly, his prayer for an injunction will be refused.

Having thus concluded, any opinion I may hold on the question as to the alleged illegal acts of defendants and as set out in the petition, and as to whether such acts are enjoinable in equity, as for continuous trespass if there is irreparable injury or multiplicity of suits to be avoided—a question of prime importance to

the citizen and one upon which I entertain definite notions—becomes wholly immaterial.

It suffices to say that plaintiff, no matter what his rights may have been, for the reasons given and in accordance with fundamental principles of equity, is remitted to whatever remedy he may have at law.

Petition dismissed.